**2009 BNH 012**     Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 08-10020-JMD |
| | Chapter 7 |
| Sarah A. Kainu, | |
|     Debtor | |
| | |
| Sarah A. Kainu, | |
|     Plaintiff | |
| | |
| v. | Adv. No. 08-1005-JMD |
| | |
| Sallie Mae, Inc., Granite State Management & Resources, | |
| New Hampshire Higher Education Assistance Foundation, | |
| and Wachovia Bank, | |
|     Defendants | |

*Carl D. Hanson, Esq.*  
*The Law Offices of William Howard Dunn*  
*Claremont, New Hampshire*  
*Attorney for Debtor/Plaintiff*

*Grenville Clark, III, Esq.*  
*Gray, Wendell & Clark, P.C.*  
*Manchester, New Hampshire*  
*Attorney for Defendant Sallie Mae, Inc.*

*Christopher J. Somma, Esq.*  
*Mark F. Weaver, Esq.*  
*Ford & Weaver, P.A.*  
*Portsmouth, New Hampshire*  
*Attorneys for Defendants Granite State Management & Resources and*  
*New Hampshire Higher Education Assistance Foundation*

## MEMORANDUM OPINION

### I. INTRODUCTION

Sarah Kainu (the "Debtor") filed this proceeding seeking to except her student loan obligations to Sallie Mae, Inc. ("Sallie Mae"), Granite State Management & Resources ("Granite

State"), New Hampshire Higher Education Assistance Foundation ("NHHEAF"), and Wachovia Bank from discharge under 11 U.S.C. § 523(a)(8).  Wachovia Bank defaulted and the Court entered a final judgment discharging the Debtor's obligation to the bank on December 17, 2008.  The Court conducted a trial of the Debtor's claims against the remaining defendants on February 6, 2009, and took the matter under advisement.  This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

The Debtor is a twenty-six year old woman in good health who is married and has a three year old child.  In 2001, the Debtor graduated from Stevens High School in Claremont, New Hampshire.  Starting in the fall of 2001, the Debtor borrowed money from the defendants, or their predecessors-in-interest, in order to attend a thirteen-month culinary arts program at McIntosh College in Dover, New Hampshire.  On August 28, 2001, the Debtor borrowed $2,625.00 from NHHEAF; on December 10, 2001, she borrowed $5,000.00 from Granite State; on August 7, 2002, she borrowed an additional $2,187.00 from NHHEAF; on August 19, 2002, she borrowed $11,500.00 from Sallie Mae; and on August 20, 2002, she borrowed an additional $2,000.00 from Sallie Mae.  In total, the Debtor borrowed $23,312.00 between August 2001 and August 2002 to pay for her education.  After completing the program, the Debtor received a culinary arts diploma and was awarded an associate's degree.

Upon receiving her culinary arts degree, the Debtor obtained a job as a cook at the Backside Inn at Mount Sunapee where she earned approximately $10,000.00 per year. While working at the Backside Inn, the Debtor obtained a second job in the Claremont School District working as an assistant teaching culinary arts to high school students. Her starting salary was $16,000.00. The Debtor worked both jobs for a year. When the Debtor became pregnant in 2005, she left her job at the Backside Inn.

The Debtor has been working full-time as a teaching assistant in the Claremont School District for the past five years. During this time her salary has increased from $16,000.00, which she received her first year of teaching, to $28,957.75, her current salary as shown on the Debtor's most recent W-2 form. In addition to working at the school, the Debtor also teaches a five-week class in the fall for which she earns $350.00 and works sporadically in the summer doing catering for which she earned $1,010.00 in 2007 and $880.00 in 2008.

Between the time the Debtor completed her culinary arts program in 2002 and the time she filed bankruptcy on January 4, 2008, the Debtor made sporadic payments to her student loan creditors. It appears she made a total of nine payments of $50.00 each to NHHEAF; in addition, the NHHEAF loans have been in various states of deferment and forbearance during this period. It also appears the Debtor made numerous payments of $50.00 each to Granite State. In addition, the Debtor's 2006 income tax refund in the amount of $2,111.00 was garnished and applied toward the Debtor's student loan obligations.

On or about the date the Debtor filed bankruptcy, she owed the following: $3,234.93 on her first loan from NHHEAF; $6,076.76 on her loan from Granite State; $2,695.52 on her second loan from NHHEAF; $24,138.81 on her first loan from Sallie Mae; and $4,330.62 on her second loan from Sallie Mae. In total, the Debtor owed these student loan creditors $40,476.64. On a

3

monthly basis prepetition, the Debtor owed the defendants a total of $551.07, consisting of $61.00 owed to NHHEAF,[1] $50.00 owed to Granite State,[2] $373.81 owed to Sallie Mae on its first loan,[3] and $67.16 owed to Sallie Mae on its second loan.[4]  At the time the Debtor filed bankruptcy both NHHEAF and Granite State had accelerated their notes, resulting in the entire unpaid balances of $3,234.93 and $2,695.52 owed to NHHEAF and $6,076.76 owed to Granite State being "immediately due and payable."[5]  Prior to trial, in accordance with the Court's pretrial scheduling order, Sallie Mae voluntarily offered to restructure the Debtor's student loan debt at an aggregate principal balance of $32,084.67 with a reduced interest rate of 6% to be repaid at the rate of $206.72 per month for twenty-five years commencing January 1, 2009. NHHEAF and Granite State apparently are willing to have their notes repaid under the terms in effect prior to acceleration.[6]

---

[1] NHHEAF's payment was for both loans and included interest at the rate of 7.14%.  Payments were to be made over 97 months.

[2] Granite State's payment included interest at the rate of 8.42%.  Payments were to be made over 173 months.

[3] Sallie Mae's payment on the first loan included interest at the rate of 15.875%.  Payments were to be made over 180 months.

[4] Sallie Mae's payment on the second loan included interest at the rate of 15.875%.  Payments were to be made over 181 months.

[5] It is unclear from the record when the notes were accelerated but it is clear that NHHEAF's notes gave it the option to accelerate upon default, and Granite State's note gave it the option to accelerate upon default but also provided for the note to be "automatically accelerated" in the case of "default due to bankruptcy."

[6] NHHEAF also made a vague proposal postpetition that the Debtor could "rehabilitate" her accelerated loan by making payments of $50.00 per month until the loan was rehabilitated, at which point payments would increase to "approximately $80.00 per month."  Postpetition, Granite State offered to reinstate the note if the Debtor began payments of $50.00 per month pursuant to the original note until the loan was paid in full.

The Debtor currently earns approximately $30,000.00 per year,[7] or approximately $2,500.00 per month, from her various jobs which money she uses to support herself and her child. The Debtor has various expenses deducted from her pay, including $311.30 for payroll taxes and Social Security, $202.41 for medical insurance, and $120.12 for mandatory retirement contributions,[8] resulting in net income of $1,866.17 per month. In addition, the Debtor has received income tax refunds the last few years, including $3,749.00 for tax year 2006 and $5,522.00 for tax year 2007, which the Debtor has used to pay her creditors and household expenses.

The Debtor's spouse was recently released from prison, having spent more than two years in jail for violating parole with respect to a felony conviction; he is currently unemployed. As a condition of his probation, the Debtor's spouse is required to find employment, failing which he will return to jail. To date he has no employment prospects, despite applying for numerous jobs in the construction and retail fields, which jobs are likely to pay no more than minimum wage. Prior to his imprisonment, the Debtor's spouse did not contribute any money toward the family's expenses; instead, he maintained sole custody and control of his earnings and used them to pay only his own expenses.

The Debtor's monthly expenses are minimal and do not include money for recreation or dining out. At the time she filed bankruptcy, the Debtor paid $600.00 in rent, $130.00 for

---

[7] The Court derives this number from the Debtor's teaching salary of $28,957.75, course salary of $350.00, and average catering earnings of $945.00, which equal $30,252.75.

[8] The Debtor also has a deduction for a day care flexible spending account. Money is taken from the Debtor's pay pre-tax on account of the Debtor's day care expenses and then reimbursed to the Debtor. For ease of discussion, the Court has included the pre-tax deduction amount as part of the Debtor's day care expense in the discussion below on expenses.

5

electricity and heating fuel, $50.00 for telephone,[9] $500.00 for food, $150.00 for clothing, $112.00 for laundry and dry cleaning, $25.00 for medical and dental expenses, $250.00 for transportation, and $533.64 for day care, resulting in total expenses of $2,350.64.  In answers to interrogatories dated March 2008, the Debtor indicated she paid $600.00 in rent, $175.00 for electricity and heating fuel, $50.00 for telephone, $300.00 for food, $50.00 for clothing, $0 for laundry and dry cleaning, $0 for medical and dental expenses, $184.00 for gas and car insurance, and $560.00 for day care, resulting in total expenses of $1,919.00.  The Debtor testified that since her husband's release from prison the household expenses have increased approximately $405.00 per month, reflecting increases of $100.00 for electricity and heating fuel, $100.00 for food, $40.00 for car insurance, $25.00 for medical expenses, $60.00 for gas, and $80.00 for his probation and restitution payments.  The Debtor was eligible for and received $300.00 in fuel assistance this past winter.

## III. DISCUSSION

Pursuant to 11 U.S.C. § 523(a)(8), a debtor is not permitted to discharge educational loans unless excepting the loans from discharge "would impose an undue hardship on the debtor and the debtor's dependents."  In determining what constitutes undue hardship this Court has previously decided to follow the three-part test set forth in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1995).  See, e.g., McClain v. Am. Student Assistance, 272 B.R. 42, 47 (Bankr. D.N.H. 2002); Grigas v. Sallie Mae Servicing Corp. (In re Grigas), 252 B.R. 866, 874 (Bankr. D.N.H. 2000).  Under Brunner, student loan obligations impose an undue hardship within the meaning of the statute, and can be discharged, if:

---

[9] The Debtor does not have a cell phone.

> A. The debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loan;
>
> B. Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and
>
> C. The debtor has made good faith efforts to repay the loan.

Brunner, 831 F.2d at 396; McClain, 272 B.R. at 47; Grigas, 252 B.R. at 874; Garrett v. New Hampshire Higher Educ. Assistance Found. (In re Garrett), 180 B.R. 358, 362 (Bankr. D.N.H. 1995). A debtor must demonstrate the existence of all three factors in order to obtain a discharge of her student loans.

### A. The First Prong of the Brunner Test

The first issue is whether the Debtor can maintain, based on her current income and expenses, a minimal standard of living for herself and her dependents if forced to repay her student loans. In Grigas, the Court explained that the undue hardship analysis may be done on a loan-by-loan basis, with the result that some of a debtor's student loans may be discharged while others may be excepted from discharge. Grigas, 252 B.R. at 873-74. The Court analyzes each loan in chronological order with the oldest loan being analyzed first. Id. at 876.

At the time of trial, the Debtor owed a total of $3,234.93 to NHHEAF on her oldest loan. This loan had been accelerated by the time the Debtor filed bankruptcy so that the total amount due of $3,234.93 was the amount due and payable on the petition date. Because the loan is no longer in a periodic repayment status, the Court must first consider the total amount due as it conducts its Brunner analysis.[10]

---

[10] In Barron v. Texas Guaranteed Student Loan Corp. (In re Barron), 264 B.R. 833 (Bankr. E.D. Tex. 2001), the court concluded that the term "forced to repay" takes on an entirely new meaning when a student loan creditor secures a judgment against a debtor prepetition so courts must consider the judgment amount when undertaking the Brunner analysis as there is no longer any repayment period for the loan. In Hollins v. United States Dept. of Educ. (In re Hollins), 286 B.R. 310 (Bankr. N.D. Tex. 2002), the

7

As described above, the Debtor has net income of $1,866.17 per month.  During the time the Debtor has been in bankruptcy, her monthly expenses have ranged from $2,350.64 at the time she filed bankruptcy in January 2008, down to $1,919.00 when she completed her answers to interrogatories in March 2008, and up an additional $405.00 to approximately $2,325.00 after her husband's release from prison at the end of 2008.  At all times, she earned less than her monthly expenses, which do not include any payments on her student loan obligations.  Even if the Court were to include as income the Debtor's average tax refund of $386.29 per month,[11] the Debtor still experiences a shortfall each month of approximately $75.00.  The Debtor testified that she lives "paycheck to paycheck."

The student loan creditors suggested at trial that the Debtor could obtain a different job with more hours[12] during the school year and obtain full time employment in the summers.  The Debtor testified that she needed to keep her school job as it provided her with excellent benefits, including medical insurance, which she needs for herself and for her child who was recently diagnosed with asthma.  The Debtor also indicated that it was not realistic for her to obtain an

---

court agreed that when student loans are past due and beyond the repayment period, the court can no longer consider whether additional circumstances will likely cause a debtor to be unable to make loan payments; however, in determining undue hardship, the court was willing to consider three alternative administrative repayment schemes that the creditor had indicated at trial would be offered to the debtor prior to the commencement of any collection actions.  In Grawey v. Illinois Student Assistance Comm'n (In re Grawey), Nos. 00-83643, 01-8010, 2001 WL 34076376 (Bankr. C.D. Ill. Oct. 11, 2001), the court disagreed with the Barron approach indicating the fact that a student loan lender obtains a judgment before bankruptcy should not give the debtor a "free pass" on the Brunner test's second prong as almost all debtors who seek a hardship discharge of a student loan are in default, thereby enabling the lender to accelerate the loan and sue for judgment.

[11] This is the monthly average of the Debtor's income tax refunds of $3,749.00 for 2006 and $5,522.00 for 2007.

[12] While the Debtor classifies her job as full time, it apparently requires only thirty-five hours a week at school.  The Debtor testified that she works more than that as she is often required to perform tasks after school or in the evening.

8

additional job in the summer as the summer break is only eight weeks long, and she would have to spend more money on day care.  This second job would likely be seasonal and low paying, and might require her to work in the evening or weekends (e.g., retail or food service jobs).  The Court finds that, given her educational background, her job experience, and the age of her child, additional employment during the school year or during the eight-week summer break will not materially increase her disposable income due to increased child care expenses.

Given this state of affairs and the fact that the Debtor does not appear to have any ability to cut expenses at this time, the Court finds the Debtor currently has no ability to make lump sum payments totaling $5,930.45 to NHHEAF and $6,076.76 to Granite State.  Based on the Debtor's current income and expenses, the Debtor would be unable to maintain a minimal standard of living for herself and her dependent if forced to repay these loans.  In addition, the Court finds that the Debtor would be unable to make monthly payments of $80.00 to NHHEAF and $50.00 to Granite State as her budget leaves no disposable income with which to make these payments.

Under the terms of the Debtor's notes with Sallie Mae, the Debtor must make payments of $373.81 on her first loan with Sallie Mae and $67.17 on her second loan with Sallie Mae.  Prior to trial, Sallie Mae voluntarily offered to restructure the Debtor's student loan debt to be repaid at the rate of $206.72 per month for twenty-five years.  Given the Debtor's current income and expenses, she has no ability to make Sallie Mae's contract payments of $440.98 per month, nor the reduced payment of $206.72 per month.  Accordingly, the Court finds that the Debtor has satisfied the first prong of the Brunner test as to all of her student loans.

### B.  The Second Prong of the Brunner Test

The second issue for the Court to determine is whether additional circumstances exist indicating that the Debtor's state of affairs is likely to persist for a significant portion of the

repayment period of the student loans. In describing the second prong of the Brunner test, courts have stated that there must be a "hopelessness for the indefinite future as to any possibility of repayment." Keilig v. Massachusetts Higher Educ. Assistance Corp. (In re LaFlamme), 188 B.R. 867, 870 (Bankr. D.N.H. 1995).

In applying this prong to NHHEAF's and Granite State's loans as accelerated, the Court finds that the Debtor will have no ability in the future to make payments on these loans as the notes are immediately due and payable in full. The Court can conceive of no scenario, absent the Debtor receiving some unanticipated windfall, under which the Debtor would have the ability to make lump sum payments to these creditors totaling $12,007.21. In addition, even applying the second prong to NHHEAF's and Granite State's repayment schedules, and Sallie Mae's offered restructuring, the Court still finds that the Debtor will have no ability to make payments on these loans in the future as the Debtor's situation is unlikely to change for a significant portion of the repayment periods.

At trial the student loan creditors suggested that the Debtor's income is likely to increase over time, especially if her spouse were to obtain a job and contribute his income toward the household expenses, while the Debtor's expenses, particularly the day care expense for her daughter, will likely decrease over time. The Court agrees that the Debtor's salary is likely to increase over time. However, there is no evidence that the Debtor will be able to obtain a different or higher paying job, which would include medical insurance, given her educational background and work experience. The Debtor is employed in a stable, well-paying job. The Court finds the Debtor's job as a culinary arts teaching assistant appropriate and well-suited employment that utilizes the skills she learned in obtaining the degree with the funds loaned to her by the defendants. The salary, benefits, and work schedule make it an excellent job for the

Debtor who is essentially a single parent. The Court finds that the Debtor is not underemployed. While the Debtor is likely to receive raises each year, there is nothing in the record that would support a finding that these raises will exceed increases in the cost of living that will occur during a substantial portion of the repayment period of the Debtor's student loans.

The student loan creditors argued further that the Court should consider income contributions from the Debtor's spouse when considering whether the Debtor's current state of affairs is likely to persist. The Court finds no evidence that the Debtor's husband can be relied upon to contribute to household income or to pay expenses. Even if the Debtor's husband were to obtain a job in the future and not return to prison, the undisputed evidence at trial was that during the three years prior to his incarceration the Debtor never saw her husband's paycheck; rather, he kept his paycheck and used it to pay his own expenses. It is undisputed that the husband currently has no car and would need to purchase one to travel to a job. Further, the evidence at trial suggested that the couple's relationship has been rocky since the husband's release from prison. For these reasons, the Court finds the relationship to be unstable and no basis exists to conclude that there will be any net contribution from the husband.

At trial, the student loan creditors argued that the Debtor's expenses will decrease during the length of the repayment period, primarily due to a decrease in child care expenses. The Debtor currently pays $560.00 per month for day care which she must continue to pay until her child reaches kindergarten age in 2011. At that point the child will be in school for half-days. However, the Debtor still will have some significant day care expense. Even when the Debtor's child starts first grade in 2012, the Debtor's child still will likely need some before and after school care. The cost of this care was not put into evidence. Assuming the Debtor's day care expense were reduced by half, the Court is not satisfied that the Debtor would have funds to

make any payments on her student loans as it is just as likely that other expenses for the Debtor's child would increase over time, e.g., food, clothing, school, and recreational activities. In addition to those expenses, it is likely that the Debtor will need to replace her 1999 vehicle during the repayment period which likely will result in a new monthly expense. Thus, based upon the record before it, the Court finds that the Debtor's ability to repay any of her student loans for the foreseeable future is hopeless. The Debtor has satisfied the second prong of the Brunner test.

### C.  The Third Prong of the Brunner Test

The third issue is whether the Debtor has made good faith efforts to repay her loans. The defendants do not challenge this prong of the Brunner test as it is undisputed that the Debtor made various payments to the defendants prior to filing bankruptcy, and the Debtor sought and received various deferments and forbearances. For that reason, the Court finds that the Debtor has made a good faith effort to repay her student loan obligations. See Grigas, 252 B.R. at 874 (holding that the debtor had satisfied the third prong of the Brunner test because, although her payments were few and intermittent, the debtor had devoted additional income to paying such loans and had made significant efforts to restructure them).

### IV.  CONCLUSION

The Court concludes the Debtor has satisfied the Brunner test and demonstrated that repayment of her student loan obligations to NHHEAF, Granite State, and Sallie Mae would impose an undue hardship on her and her child within the meaning of 11 U.S.C. § 523(a)(8). Accordingly, the Debtor's student loan obligations to NHHEAF, Granite State, and Sallie Mae shall be discharged. This opinion constitutes the Court's findings of fact and conclusions of law

in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

    ENTERED at Manchester, New Hampshire.


Date:   April 14, 2009                          /s/ J. Michael Deasy
                                               J. Michael Deasy
                                               Bankruptcy Judge